Harold E. WRIGHT, Appellant and Cross–Appellee,

v.

Lorraine H. WRIGHT, Appellee and Cross–Appellant.

Nos. S–5865, 5866.

Supreme Court of Alaska.

Oct. 13, 1995.

Gregory C. Taylor and Mark P. Melchert, Jermain, Dunnagan & Owens, P.C., Anchorage, for Appellant and Cross–Appellee.

Sharon L. Gleason, Rice, Volland, Gleason & Taylor, P.C., Anchorage, for Appellee and Cross–Appellant.

Before MOORE, C.J., RABINOWITZ, MATTHEWS, COMPTON and EASTAUGH, JJ.

### OPINION

RABINOWITZ, Justice.

## I. INTRODUCTION

Tex and Lorraine Wright were separated on November 7, 1991, after 36 years of marriage. At the time of trial, Tex was 75 years old and Lorraine was 60 years old. There are two children of the marriage, Donna and Bill, who are now adults. The superior court allocated 60% of the marital estate, valued at $6,584,063, to Lorraine. This appeal and cross-appeal require us to determine whether the superior court erred in valuing a solely-owned corporation, in failing to include a potential malpractice claim in the marital estate, in holding that a gift to the parties' son was not part of the marital estate, in its allocation of the parties' assets in making its property division, and in awarding Lorraine partial attorney's fees.

## II. DISCUSSION

### A. Valuation of Wrightway [1]

■ The major dispute between Tex and Lorraine is the inclusion of good will by the superior court in its valuation of Tex's solely-owned corporation, Wrightway Auto Carriers, Inc. (Wrightway). Wrightway, which was founded over 30 years ago, transports new and used cars between Alaska and the rest of the United States. By the time of separation, Tex had little involvement in Wrightway's day-to-day operations. Bill, the

parties' son, was in the process of taking over the business.

At trial, Lorraine's expert, Ronald Greisen, testified that Wrightway, including good will, was worth $1,385,781. In arriving at Wrightway's value Greisen used the capitalization of excess earnings method. One of Tex's two experts, Gary Johansen, expressed no opinion on the value of Wrightway but did a "sanity test" on Greisen's calculations. Tex's other expert, Phil Ramos, testified that by the time of trial Wrightway had become an insolvent corporation with a value of −$406,541. Ramos used the straight capitalization of earnings method in arriving at his determination of Wrightway's value.[2]

The superior court concluded that Wrightway possesses marketable good will, the value of which should be included in the marital estate, and adopted Greisen's capitalization of excess earnings method to determine its value. However, the superior court rejected two facets of Greisen's calculations. First, Greisen had only allowed Tex a yearly salary of $40,000. The superior court adjusted the calculations to allow for a yearly salary of $100,000. Second, Greisen calculated Wrightway's potential corporate tax liability at $300,000. The superior court adjusted the calculations to reflect a tax liability of $500,000. After making these adjustments, the superior court valued Wrightway, including good will, at $942,219.

Tex argues that the superior court erred in valuing Wrightway for the following reasons: (1) Wrightway's good will is not marketable; (2) use of the capitalization of excess earnings method was improper; and (3) the superior court misapplied the capitalization of excess earnings method, including the calculation of Wrightway's potential corporate tax liability.

---

1. Issues going to the valuation of a solely-owned corporation, including the calculation of good will, present questions of fact. *Moffitt v. Moffitt,* 813 P.2d 674, 676 (Alaska 1991) (*Moffitt II*). This court will set aside a superior court's factual determination only upon a finding of clear error. *Id.* A factual determination is clearly erroneous if it is unsupported by the record, or if this court is left with a definite and firm conviction that a

mistake has been made. *See Moffitt v. Moffitt,* 749 P.2d 343, 347 (Alaska 1988) (*Moffitt I*); *Hunt v. Hunt,* 698 P.2d 1168, 1171 (Alaska 1985).

2. The parties also presented evidence relating to Wrightway's potential corporate tax liability for 1989 through 1992.

■ The good will of a corporation is property which may be included in the marital estate in a divorce proceeding. *Hunt v. Hunt,* 698 P.2d 1168, 1170 (Alaska 1985). In *Moffitt I,* this court articulated the following methodology for assessing the divisibility of professional good will:

> Preliminarily, the trial court must decide whether good will exists. If the trial court finds good will exists, it then must determine whether the good will could actually be sold to a prospective buyer. If the trial court determines either that no good will exists or that the good will is unmarketable, then no value for good will should be considered in dividing the marital assets. Conversely, the good will should be considered if the evidence suggests that it has value and is marketable. In that case, the trial court should use one or more principled methods of valuation.

*Moffitt I,* 749 P.2d at 347 (footnotes omitted).

1. *The superior court did not err in concluding that Wrightway's good will is marketable.*

■ The superior court specifically concluded that Wrightway's good will is marketable. To this effect, the superior court stated:

> The company is a long-term established Anchorage business with name recognition and an established market share. It has the unique position of having a lease in the Anchorage port area as well as related assets in Seattle and Fairbanks which contribute to the transportation network. It [is] a long-term financially successful company which possesses goodwill as defined by our Supreme Court.

The trial record supports this conclusion. First, the superior court noted that "there was uncontradicted testimony that several years prior to separation, Ryder, a corporation in a similar business, had offered Mr. Wright 1.5 million for the business. It was comprised of 1 million in cash and the balance over time." In addition, the superior court noted Tex's specific intent to pass on the business to his son. Third, Tex testified that he could sell Wrightway for several hundred thousand dollars. Finally, Lorraine's expert testified that Wrightway's good will was marketable based on his extensive review of Wrightway's financial records, deposition testimony, and study of industry transactions. Based on the record, we conclude that the superior court's determination that Wrightway's good will is marketable is not clearly erroneous.

2. *The superior court did not err in utilizing the capitalization of excess earnings method.*

■ Capitalization of excess earnings is one of the recognized methods for appraising business good will and has been approved by this court on several occasions. *Miles v. Miles,* 816 P.2d 129, 131 (Alaska 1991); *Moffitt II,* 813 P.2d at 676 n. 3; *Moffitt I,* 749 P.2d at 348; *Hunt,* 698 P.2d at 1170 n. 1. Under the capitalization of excess earnings approach, good will is calculated by capitalizing excess earnings. *Moffitt II,* 813 P.2d at 676 n. 3. "Excess earnings are earnings which remain after earnings on tangible assets and owner's compensation for services are deducted from total earnings." *Id.*

In deciding to utilize the capitalization of excess earnings method, the superior court noted that "[t]his method was adopted by Lorraine as the appropriate method. It was utilized by Tex as a 'sanity check' on his valuation approach." [3] The superior court was ultimately "persuaded by the testimony of Lorraine's expert that goodwill exists in this case as there is an expectation of earnings in excess of a fair return on the capital invested in tangibles or other means of production."

Given our prior approval of the capitalization of excess earnings method, as well as the evidence in the record which supports the use of this method to value Wrightway, we conclude that the superior court did not err in adopting the capitalization of excess earnings methodology for valuing Wrightway.

**3.** Tex's expert who reviewed Greisen's calculations, Gary Johansen, testified that had he done an independent valuation, he would have utilized the capitalization of excess earnings method to value Wrightway.

3. *The superior court did not err in applying the capitalization of excess earnings method.*

In calculating Wrightway's good will, both Tex and Lorraine relied on the work of Shannon Pratt, an expert recognized as an authority on business valuation. Pratt summarizes the steps in applying the excess earnings methodology as follows:

1. Determine the value of net tangible assets.

2. Determine the normalized level of earnings.

3. Apply an appropriate rate of return to the net tangible asset value and subtract the result from the normalized earnings. The result is the excess earnings; that is, the amount of earnings above a fair rate of return.

4. Apply an appropriate capitalization rate to any excess earnings.

5. Add the values from steps 1 and 4.

Shannon P. Pratt, *Valuing Small Businesses and Professional Practices,* 156–57 (1986). Tex argues that the superior court erred in applying steps one through four of this method.

■ First, Tex argues that the superior court erred in calculating the value of Wrightway's net tangible assets. The superior court determined that Wrightway's potential corporate tax liability for 1989 through 1992 is $500,000. Tex argues that the $500,000 only reflects Wrightway's potential liability for the years of 1989 and 1990, and does not include the years 1991 and 1992.

However, Lorraine presented evidence at trial that the estimated potential liability for all four years is between $294,000 and $499,000. Moreover, at a hearing after trial the superior court requested the parties to file additional pleadings as to whether the $500,000 estimate of contingent tax liability was for all four years or only two years. There-

after, the superior court clarified that its initial decision included all four years. Based on this record, we conclude that the superior court's valuation of Wrightway's potential corporate tax liability, and thus of Wrightway's net tangible assets, was not clearly erroneous.

■ Second, Tex argues that the superior court erred in calculating Wrightway's normalized level of earnings[4] on a before-tax rather than after-tax basis. At trial, Greisen, Lorraine's expert, testified that Wrightway should be valued based on before-tax earnings. The superior court concluded that Greisen's before-tax approach was "persuasive to the court as the more traditionally accepted method of valuation in this area." Moreover, in *Hunt,* 698 P.2d at 1170 n. 1, we held that it was not clearly erroneous for the superior court to value a spouse's interest in a close corporation based on before-tax earnings. Likewise, here we conclude that it was not clearly erroneous for the superior court to rely on before-tax earnings in determining Wrightway's normalized level of earnings.

■ Third, Tex argues that the superior court erred in applying a 12% rate of return to Wrightway's net tangible assets.[5] Tex's expert, Johansen, testified that he would have applied a 25.2% rate of return which he adopted from the Troy Almanac of Financial Ratios. Lorraine's expert, Greisen, testified that the superior court should use a 12% rate of return. Greisen explained that Johansen's 25.2% rate of return is an average of all companies which includes both a return on tangible and intangible assets. Greisen testified that a 12% rate is more appropriate for a return on only tangible assets. Because Greisen's testimony provides a reasonable evidentiary basis for the superior court's selection of the 12% rate of return, we conclude that this decision was not clearly erroneous.

■ Fourth, Tex argues that the superior court erred in applying a 25% capitalization

4. Normalization of earnings is the process of adjusting earnings to reflect the true earning ability of the corporation.

5. The rate of return on net tangible assets is a risk calculation factor. "Underestimating the

appropriate capitalization rate (expressed as a percentage rate of return) leads to overvaluing the business or practice, and vice versa." Pratt, *supra,* at 138.

rate to Wrightway's excess earnings.[6] The superior court adopted Greisen's capitalization rate of 25%, or a multiplier of four. Both Greisen and Johansen, Tex's expert, testified that a capitalization rate of 25% for Wrightway's excess earnings was appropriate. Ramos, Tex's other expert, disagreed and suggested that a capitalization rate as high as 131% would be appropriate.

In *Hunt,* we noted that in New York, three is the capitalization factor least in need of justification. *Hunt,* 698 P.2d at 1170 n. 1 (citing *Dugan,* 92 N.J. 423, 457 A.2d at 11). In *Dash v. State,* 491 P.2d 1069, 1072 (Alaska 1971), this court approved a capitalization rate of 20%, or a multiplier of five, for the projected income stream of a proposed but yet undeveloped subdivision. Therefore, based on Greisen and Johansen's testimony, as well as prior Alaska case law, we conclude that the superior court's decision to apply a 25% capitalization rate was not erroneous.

B. *Wrightway's Potential Malpractice Claim* [7]

■ During trial, Lorraine attempted to introduce evidence of Wrightway's potential malpractice claim against its accountant based on misadvice which allegedly caused Wrightway to underpay its taxes for the years 1989 through 1992. In rejecting this offer, the superior court stated, "I am not going to consider a malpractice claim, I'm not going to quantify a malpractice claim, I'm not going to make any rulings affecting a potential malpractice claim at all." The superior court further stated that "I'm not considering that. That is so tangential, so unquantifiable, so unproven...."

On cross-appeal, Lorraine argues that, having determined Wrightway's potential corporate tax liability for 1989 through 1992

to be $500,000, the superior court erred in refusing to allow evidence on the value of Wrightway's potential malpractice claim against its accountant. In support, Lorraine notes that legal claims, including malpractice claims against a company's accountant, are an asset of the corporation. *National City Bank v. Coopers & Lybrand,* 409 N.W.2d 862, 868 (Minn.App.), *review denied,* (Minn. 1987). Moreover, Lorraine cites several cases in which the courts have held that unliquidated personal injury actions, including actions in which a complaint has not yet been filed, constitute assets of the marital estate. *Bunt v. Bunt,* 294 Ark. 507, 744 S.W.2d 718, 721 (1988); *Heilman v. Heilman,* 95 Mich.App. 728, 291 N.W.2d 183 (1980).

■ All of the cases cited by Lorraine are distinguishable from the present case in that the claims at issue in the other cases had accrued, while the professional malpractice claim in the present case has not. *Bunt,* 294 Ark. 507, 744 S.W.2d at 720; *Collins v. Federal Land Bank of Omaha,* 421 N.W.2d 136, 139–40 (Iowa 1988); *Heilman,* 95 Mich. App. 728, 291 N.W.2d at 184. For example, in *Collins,* the court distinguished claims which had accrued prior to the Collinses' bankruptcy filing from claims which had accrued after the petition was filed. *Collins,* 421 N.W.2d at 139. The claims which had accrued prior to filing were included in the bankruptcy estate while claims accruing after filing were not. *Id.* at 139–40. The court stated that under Iowa law a cause of action does not accrue until the wrongful act produces injury to the claimant. *Id.* at 139.

■ In Alaska, "a cause of action accrues when all the essential elements forming the basis for the claim have occurred." *Lamoreux v. Langlotz,* 757 P.2d 584, 585 (Alas-

---

6. After deducting for a 12% return on Wrightway's tangible assets, Wrightway had an average of over $300,000 in excess earnings per year. These excess earnings represent a return on the corporation's intangible assets, or good will. In step four, those excess earnings are then capitalized at an appropriate rate. "The capitalization factor is generally perceived as the number of years of excess earnings a purchaser would be willing to pay for in advance in order to acquire the goodwill." *Hunt,* 698 P.2d at 1170 n. 1

(quoting *Dugan v. Dugan,* 92 N.J. 423, 457 A.2d 1, 10 (1983)).

7. The question of whether the value of a corporation's potential malpractice claim should be included in a marital estate is a legal determination to which this court applies its independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason and policy. *See Lantz v. Lantz,* 845 P.2d 429, 431 n. 1 (Alaska 1993).

ka 1988). One of the elements of a professional negligence claim is "actual loss or damage resulting from the professional's negligence." *Linck v. Barokas & Martin,* 667 P.2d 171, 173 n. 4 (Alaska 1983). In the case at bar, there has not yet been any actual loss or damage because the IRS has not yet assessed Wrightway's tax liability. Thus, we hold that the superior court did not err in refusing to allow evidence of Wrightway's potential malpractice claim against its accountant.

## C. *Tex's Gift of $143,000* [8]

Tex and Lorraine purchased a condominium in Los Angeles for their daughter, Donna, in 1985. This purchase cost the marital estate $213,000. Tex kept title to the property in his name. Donna was 37 years old at the time of trial, and had relied on the considerable financial support of her parents throughout her adult life. At trial, both Tex and Lorraine agreed that Donna's condo was Donna's exclusive property and not part of their marital estate.

Tex and Lorraine have also provided financial assistance to their son, Bill. Bill was 32 years old at the time of trial. Bill is employed by Wrightway and is being groomed to take Tex's place as head of the company. Before the parties separated, Tex provided Bill with $70,000 to use towards the purchase of a home, although Tex required Bill to sign a deed of trust on the property for this sum.

Eleven days after Lorraine filed for divorce, Tex unilaterally withdrew $143,000 out of a marital investment account. Without Lorraine's knowledge, Tex used this money to pay off Bill's outstanding mortgage and then had Bill execute a second deed of trust to Tex for the additional $143,000.

At trial, Lorraine sought to include the $143,000 in the marital estate. Specifically, Lorraine sought to void the unilateral transfer of $143,000 to Bill relying upon the authority of *Brooks v. Brooks,* 733 P.2d 1044 (Alaska 1987). To this effect, Lorraine's counsel stated as follows:

The standard is *Brooks v. Brooks,* if both spouses do not join in making the gift, it is voidable at the option of the nonparticipating spouse.... My client's testimony is she is voiding this gift, if it was in fact a gift, of the two deeds of trust to the son.

Tex argued that the $143,000 payment to Bill was intended as a gift to equalize the amount that Donna had received because he and Lorraine had agreed that the children should be treated equally.

The superior court concluded that the $143,000 was a gift and thus not voidable under *Brooks.* The superior court found that there was a fundamental understanding between Tex and Lorraine that their children would be treated equally. Based on this conclusion, the superior court suggested that the parties add up all the gifts to Donna and Bill over the past five years, and that "if things don't work out evenly it means that someone's given a gift without the consent of the other party." Thus, any excess "gifts" would be included in the marital estate. As to the *Brooks* standard, the superior court reasoned as follows:

But despite *Brooks v. Brooks* I would be very disinclined to say that you can unilaterally withhold permission to give a gift to one child if that permission is unreasonably withheld.... I mean, what I'm concerned about is when we add up these things that these kids don't come out close to equal.

On appeal, Lorraine argues that the superior court erred by applying an incorrect legal standard in its treatment of Tex's $143,000 gift to the parties' son.

In *Brooks,* 733 P.2d at 1055, this court held that "any gift to a third person out of marital property is valid 'when both spouses act together in making the gift.' However, if both spouses do not join in making the gift, it is voidable at the option of the nonparticipating spouse." (Citations omitted.) The superior court concluded that there was an agreement between the parties that Donna and Bill should be treated equally, and thus that Lorraine did consent to the gift as

---

8. This issue involves a question of fact which we will set aside only upon a finding of clear error.

*See Moffitt II,* 813 P.2d at 676.

required by *Brooks*. This conclusion is supported by the record. Thus, we hold that the superior court did not err in not including the $143,000 gift in the marital estate.

### D. *Equitable Allocation of the Marital Estate* [9]

 Tex argues that the superior court erred in allocating particular items of marital property because Lorraine received virtually all of the parties' passive income-producing assets while Tex received Wrightway, "an insolvent corporation requiring his active participation, 5th and F, a property with a substantial negative cash flow, and miscellaneous other assets which produce almost no passive income."

The superior court took Tex's conduct into consideration in allocating items of marital property. With respect to the allocation of certain non-liquid assets to Tex, the superior court noted that Tex had converted marital cash into non-liquid assets and thus "caused his own problems." The superior court also stated that "to the extent he has made a bad investment by trying to hide marital assets in an unreasonable manner, he should be left with the consequences of that act."

As to the particular property Tex received, based on the superior court's valuation of Wrightway, it is clear that the superior court did not consider Wrightway to be an insolvent corporation. Also, although Tex was awarded the 5th and F property, the superior court valued the property as a $255,118 liability. Thus, the marital estate effectively paid him to assume this property through the award of other assets.[10] Finally, the record contains several references to cash outlays made by Tex following trial in this case suggesting he is not as illiquid as he claims. For example, just three months after trial, Tex gave Lorraine $275,000 in cash to ac-

quire the Big Lake vacation home which was awarded to Lorraine.

Based on the foregoing, we conclude that the superior court did not abuse its discretion in its allocation of particular items of marital property.

### E. *Attorney's Fees* [11]

 Tex maintained exclusive control of the marital finances, and managed the family's investments and personal expenses out of Wrightway's corporate checking account. After Lorraine filed for divorce, Tex commenced on a course of conduct in which he concealed marital funds. Lorraine's accountant estimated that Tex failed to disclose $1,337,136 in marital assets. The superior court ordered Tex to pay $125,000 of Lorraine's attorney's fees as a result of this conduct.

#### 1. *The superior court did not fail to follow the standard set out in Kowalski.*

 Tex argues that in awarding $125,000 worth of attorney's fees to Lorraine the superior court failed to follow the two-step process mandated in *Kowalski.* In *Kowalski,* we held that AS 25.24.140, the statute authorizing attorney's fees in divorce proceedings, requires that such an award be based on the parties' relative economic circumstances and earning powers. *Kowalski,* 806 P.2d at 1372. However, we also stated that vexatious conduct by one party which leads to increased attorney's fees will justify a fee award to the burdened spouse, so long as the court also considers the statutorily mandated factors. *Id.* at 1373. To this effect, we articulated the following two-step process for awarding attorney's fees based on vexatious conduct:

> [I]n making an increased fee award, the court must first determine what fee award would be appropriate under the general

9. In reviewing an allocation of marital property, this court applies the abuse of discretion standard and will not disturb the allocation unless it is clearly unjust. *Moffitt I,* 749 P.2d at 346.

10. Lorraine correctly observes that "Tex asked Judge Andrews to award him all of the assets he now claims he does not want."

11. An award of attorney's fees in a divorce action is within the broad discretion of the trial court. *Kowalski v. Kowalski,* 806 P.2d 1368, 1372 (Alaska 1991). In reviewing an award of attorney's fees, we apply the abuse of discretion standard and will not disturb such an award unless it appears that the trial court's determination was manifestly unreasonable. *Id.*

rule, and only then increase the award to account for a party's misconduct. Failure to follow this two-step process constitutes an abuse of discretion.

*Id.*

In its Proposed Decision dated May 20, 1993, the superior court stated as follows with respect to its award of attorney's fees:

There has been no serious contest that the approximate amount expended in both attorney and accountant time to track down hidden and dissipated assets is in the neighborhood of $120,000.[12] It appears that Mr. Wright concedes that there was financial misconduct which caused Lorraine to incur these additional expenses.

Also, in its oral amendments to the Proposed Decision, the superior court articulated its application of the two-step process set out in *Kowalski* as follows:

That $125,000 takes into account the vexatious conduct, that there are enough assets here, each getting enough on their own side that they should pay for their own costs and fees in the case. However, Mr. Wright's inexcusable conduct has caused a quantified $125,000 of extra fees which he is required to pay her.

And so doing the *Kowalski* two-step analysis, I would not award attorney's fees one to another, I'd require them to bear their own. I'm going to require Mr. Wright solely to bear the cost of the vexatious conduct, which I tag at $125,000.

Thus, contrary to Tex's assertions, the superior court concluded that, based on the parties' relative economic situations and earning powers, each party would bear their own fees under the general rule. The superior court further determined that, based on

Tex's conduct, Tex should pay $125,000 of Lorraine's attorney's fees. The superior court's holdings that Tex's conduct was vexatious and that such vexatious conduct caused a $125,000 increase in fees are fully supported by the evidence.[13] We therefore conclude that the superior court correctly followed the standard set out in *Kowalski* in awarding $125,000 in attorney's fees in favor of Lorraine.

### 2. *The award of attorney's fees was not manifestly unreasonable.*

 Tex also argues that the superior court erred in considering Tex's conduct both in determining the award of attorney's fees and in allocating the marital property based on a sixty/forty division. However, in its Proposed Decision, the superior court specifically stated that its decision to divide the marital property in this manner was not based on Tex's conduct. Rather, the superior court's decision was based on several of the *Merrill* factors, and most significantly upon the parties' stipulation that the estate should be divided sixty/forty in Lorraine's favor. The superior court only considered Tex's conduct in deciding which particular items of marital property to award to each party. Thus, we conclude that the $125,000 award of attorney's fees in favor of Lorraine is not manifestly unreasonable.

## III. *CONCLUSION*

Based on the foregoing, we AFFIRM the superior court's decision in all respects.

---

**12.** This figure was subsequently changed to $125,000.

**13.** At trial, Lorraine offered Exhibit No. 39 which listed $1,337,136 worth of assets which Tex failed to disclose. These assets were apparently located through the assistance of counsel and Greisen. In addition, Lorraine presented the superior court with affidavits attested to by her counsel and Greisen. Both counsel and Greisen attested that Tex had intentionally hidden marital assets and that they would spend approximately $125,000 in locating those assets. Additionally, the superior court impliedly re-

ferred to Tex's conduct as "jailable activity." In this regard, the Proposed Decision states as follows:

Exhibits 28 through 33 demonstrate, in a graphic form, just how ruthless Tex Wright was in "circling the wagons" to make certain that the only assets that were available to Lorraine were those which he controlled. His actions bespeak those of a man who insists on defining his own terms of fairness. Tex's definition of fairness apparently does not include traditional notions of honesty, fair play and equality.