**William CARVER, Appellant,**

v.

**QUALITY INSPECTION AND TESTING, INC. (I), Christian Grass and Karen Johnson, Quality Inspection and Testing, Inc. (II), Appellees.**

**No. S–7346.**

Supreme Court of Alaska.

Oct. 31, 1997.

---

Thomas R. Wickwire, Fairbanks, for Appellant.

No appearance for Appellees.

Before COMPTON, C.J., and MATTHEWS, EASTAUGH, FABE and BRYNER, JJ.

## OPINION

EASTAUGH, Justice.

### I. INTRODUCTION

William Carver appeals from the superior court's judgment valuing his one-third ownership interest in a closely-held corporation, Quality Inspection and Testing, Inc. (QIT-I), following its dissolution. Carver claims that the trial court erroneously (1) accepted the conclusions of the opposing valuation expert; (2) made fact findings underlying its valuation of QIT-I; (3) found the corporation's value to be the amount of QIT-I's initial start-up loan; (4) found that failing to give creditors notice of QIT-I's dissolution was harmless; and (5) failed to rule on Carver's claim for conversion. We affirm.

### II. FACTS AND PROCEEDINGS

In 1991 William Carver, Christian Grass, and Karen Johnson formed QIT-I, incorporated in Alaska. They were QIT-I's directors and shareholders, and each owned one-third of the corporate stock. The start-up capital for QIT-I was a $20,000 loan.

Carver, Grass, and Johnson initially worked full-time for the corporation. In 1992 Carver began working part-time for another firm, Ocean Technology, because QIT-I's business had slowed and the cash flow was not sufficient to pay the salaries of all three shareholders.

In March 1993 Carver notified Johnson and Grass that he had accepted a full-time position with Ocean Technology; thereafter he performed no work for QIT-I. Carver's full-time employment outside QIT-I led to a continuing dispute between the parties, and Carver informed Johnson and Grass that he wanted either to sell his one-third share to them or to dissolve QIT-I. Grass and Johnson felt that QIT-I had no value and were unwilling to pay Carver for his share. Carver then requested dissolution of QIT-I. In August 1993 the shareholders dissolved QIT-I, and were issued a Certificate of Dissolution.

In July 1993, before QIT-I's dissolution, Johnson and Grass received a $125,000 loan from Key Bank. Johnson and Grass asked Carver to provide them with financial infor-

mation for the loan application, but Carver refused. Johnson and Grass then falsely stated on the application that they each had a fifty-percent interest in QIT–I. Grass admitted at trial that he and Johnson misrepresented their ownership interest because Carver refused to help get the loan and QIT–I needed the money to stay afloat. At dissolution, QIT–I retained $73,000 of the loan proceeds, and had paid all of its accounts payable.

In August 1993 Johnson and Grass formed a new corporation called Quality Inspection and Testing, Inc. (QIT–II). QIT–II assumed all debts of QIT–I and retained possession of QIT–I's assets and equipment.

Carver sued QIT–I, QIT–II, Grass, and Johnson in 1994, alleging that Johnson and Grass failed to comply with the corporate dissolution statute because they failed to inform QIT–I's creditors of the dissolution, converted the assets of QIT–I, and violated the corporate dissolution statutes that protect minority shareholders.

Carver's claims were heard in a bench trial in 1995. Two business valuation experts, Paul Taylor, an economist, and Gerald Richards, a certified public accountant, testified about QIT–I's dissolution value. Their opinions about QIT–I's value varied greatly. Taylor was Carver's expert. He testified that upon dissolution QIT–I was worth $139,000 under the capitalization of earnings method, and was worth $43,000 under the liquidation value method. Richards was the expert for Johnson, Grass, QIT–I, and QIT–II. He opined that QIT–I had a zero or negative value under either method.

The trial court entered final judgment for Carver, finding that QIT–I's value at dissolution was $20,000. The court awarded one-third of that value plus interest to Carver. Although the superior court determined that QIT–I had no liquidation value, the court arrived at the $20,000 value based upon the "unique situation" resulting from QIT–II tak-

ing possession of all of QIT–I's assets. The court found that because Johnson and Grass transformed QIT–I into a new entity with nearly all of the same characteristics as QIT–I, additional value was transferred to QIT–II that would not have existed if the assets of QIT–I had been liquidated. Carver appeals.

## III. DISCUSSION

### A. Testimony of the Defense Expert, Gerald Richards

Stating that it found the testimony of Gerald Richards, QIT–II's expert, "particularly credible," the superior court significantly relied upon his testimony in reaching its decision.

 Carver claims that Richards was not qualified to offer expert testimony on business valuation.[1] Richards testified at trial that he had personally evaluated approximately eight to ten businesses during his twenty-year accounting career, and had been involved in fifteen to twenty business evaluations performed by his accounting firm. His experience gave him the ability to understand financial statements and Generally Accepted Accounting Principles (GAAP). The testimony from both experts focused upon their interpretation of QIT–I's financial statements, and the use of GAAP. The court certified Richards as an expert for this reason. It was not an abuse of discretion to qualify Richards as an expert.

 Carver also contends that the trial court erred in relying upon Richards's testimony because Richards based his conclusions on unreliable financial information that Johnson prepared and that Richards did not audit for accuracy. Because Johnson admitted that she lied on her Key Bank loan application, Carver contends that the court should not have trusted the accuracy of the information she gave Richards.[2]

---

1. Alaska Rule of Evidence 702(a) provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

We review a trial court's admission of expert testimony for an abuse of discretion. *Sweet v. Sisters of Providence in Washington,* 895 P.2d 484, 494 n. 10 (Alaska 1995).

2. We review a trial court's factual findings under the clearly erroneous standard. *See* Alaska R. Civ. P. 52(a). A finding is clearly erroneous if it

The superior court asserted that its decision did not depend solely upon the testimony of one witness, but that it instead relied upon "the totality of the evidence." The trial judge was able to assess Johnson's demeanor and credibility when she testified about preparing the financial statements upon which Richards relied. The court did not err in relying upon Richards's conclusions.

Carver also contends that the income statements Johnson prepared contained a mixture of cash-based and accrual accounting and did not conform to GAAP, making their reliability suspect. Richards testified that he had Johnson make several adjustments to the statements so that the portion he relied upon to form his conclusions did conform to GAAP. Taylor conceded that Richards based his opinion on the portion of the statements that Richards stated conformed to GAAP.

Carver asserts that the trial court erred in accepting Richards's conclusions as particularly credible because Richards did not examine all of the financial information available for QIT–I while Taylor did. Richards testified that he and Taylor used very similar valuation methods, and then, using Taylor's numbers, Richards explained why his conclusions differed so greatly from Taylor's. The alleged deficiencies in both the financial information and in Richards's conclusions go to the weight and credibility of the evidence. These are matters for the fact finder. The trial court did not err in relying upon Richards's opinions.

### B. *Trial Court's Additional Factual Findings*

■ The trial court found that "[a]t the time of dissolution [QIT–I] had one contract in place that ... did not result in a net profit." Carver argues that QIT–I was having success with its contracts, and thus, that the finding was clearly erroneous. Johnson testified that QIT–I had contracts in place prior to dissolution, but that they were completed by July or August 1993. Whether QIT–I had more than one contract in place at the time of its dissolution is irrelevant because the court reasonably could have found that QIT–I did not make a net profit from its contracts, given its negative net income.

■ The trial court determined that QIT–I did not appear to have any significant goodwill upon dissolution.[3] Carver contends that the trial court erred in finding that QIT–I had no goodwill because he was aware of customers who were satisfied with QIT–I's work and whom he expected to give QIT–I repeat business. Richards, however, opined that QIT–I had minimal or zero goodwill, and neither expert factored goodwill into his valuation of QIT–I. The court did not err in finding that QIT–I had no significant goodwill.

Carver contends that the trial court clearly erred in finding that QIT–I had a "negative cash flow" upon dissolution.[4] Richards testified, however, that the income statement accurately reflected a net income of −$10,000. Given our holding that the trial court did not err in relying upon Richards's valuation of QIT–I, it was not clear error to find that QIT–I had negative cash flow at dissolution.

■ Carver argues that the trial court clearly erred in finding that no reasonable investor would have desired QIT–I at the time of its dissolution. Carver's expert conceded that QIT–I's net worth over the course of its operating history was minimal; its net worth was only $4,000 the first year of opera-

---

leaves us with a definite and firm conviction on the entire record that a mistake has been made. *City of Hydaburg v. Hydaburg Co-op. Ass'n,* 858 P.2d 1131, 1135 (Alaska 1993). We review *de novo* the application of law to the relevant facts. *See Luedtke v. Nabors Alaska Drilling, Inc.,* 834 P.2d 1220, 1223 (Alaska 1992).

Witness credibility is for the trial court to determine; we defer to those determinations. Alaska R. Civ. P. 52(a); *Evans v. Evans,* 869 P.2d 478, 480–81 (Alaska 1994).

**3.** Issues of corporate valuation, including the calculation of goodwill, present fact questions.

*Wright v. Wright,* 904 P.2d 403, 405 n. 1 (Alaska 1995). When valuing business goodwill, the trial court must first determine whether goodwill exists. *Id.* at 406. If the court finds that no goodwill exists, it should not be considered in valuing the business. *Id.*

**4.** When the trial court referred to QIT–I's cash flow, presumably it meant QIT–I's net income, which was described as −$10,000 on the income statement prepared by Johnson.

tion and $1,000 the second year. Our review of the record leads us to conclude that the trial court did not err.

### C. *Valuation of QIT–I at $20,000*

■ The trial court concluded that QIT–I had a negative liquidation value at the time of dissolution. It nevertheless found that Johnson and Grass received value from having QIT–I's assets assembled and in place when they incorporated QIT–II. The trial court then assigned a "nominal" value of $20,000 as QIT–I's dissolution value, based upon the $20,000 loan the shareholders had used to start QIT–I in 1991. The court awarded Carver one-third of this amount plus interest.

■ Carver contends here that it was error to base QIT–I's dissolution value on the amount of its initial start-up capital, instead of its value at dissolution. A trial court's valuation of a business will only be set aside upon a finding of clear error. *Moffitt v. Moffitt,* 813 P.2d 674, 676 (Alaska 1991).

We need not determine whether the trial court erred because the alleged error was harmless. Alaska R. Civ. P. 61. Given the trial court's acceptance of QIT–II's expert's conclusion that QIT–I had a negative liquidation value upon dissolution, Carver was not prejudiced by possible error in assigning a positive dissolution value of $20,000 to QIT–I. Had the trial court simply applied the liquidation value method, Carver would have received nothing for his one-third share, instead of the affirmative award the court gave him. The alleged error did not harm Carver.

### D. *Failure to Provide Notice of Dissolution to Creditors*

■ Alaska Statute 10.06.615(c) governs the procedure for a voluntary dissolution or "winding up" of a corporation.[5] All three shareholders agreed to QIT–I's dissolution. Nevertheless, the trial court found, and Johnson and Grass conceded, that none of QIT–I's creditors was given written notice of its dissolution.

Carver requested that the trial court order Johnson and Grass to notify QIT–I's creditors of the dissolution and to set a specified time period for creditors to make claims against QIT–I. The superior court denied Carver's request, finding that the failure to notify creditors was harmless because QIT–I's bills had been paid with the Key Bank loan proceeds and because Johnson and Grass personally guaranteed the Key Bank loan. The trial court also noted that Johnson and Grass had agreed in QIT–I's Articles of Dissolution that QIT–II assumed all debts of QIT–I upon QIT–II's formation.

Carver contends that the superior court erred in concluding that the failure of Johnson and Grass to notify QIT–I's creditors of its dissolution was harmless because he is personally liable for any remaining debt. Carver does not explain how he will remain personally liable for QIT–I's debts. In general, corporate directors are not personally liable for the debts of the corporation. *See* 3A *Fletcher Cyclopedia of the Law of Private Corporations* § 1117 (rev. ed. 1994) ("In the absence of some exception, neither the officers nor the directors are personally responsible for the debts of the corporation merely because they are officers or directors of that corporation.").

Although AS 10.06.615(c) requires a corporation to notify creditors of its dissolution, nothing in the Alaska Corporations Code imposes personal liability on directors solely because they have failed to notify creditors of the dissolution, absent some kind of prejudice to the creditors. *E.g., Holliday v. Henry I. Siegel Co.,* 643 S.W.2d 519, 520 (Tex. App.1982) (holding that directors' failure to give required notice to creditors upon dissolution of corporation did not, in and of itself, render directors liable as individuals for corporate debts), *aff'd,* 663 S.W.2d 824 (Tex. 1984).

Carver requested that the court place QIT–II's assets, taken from QIT–I, in trust until all of QIT–I's remaining debts were paid. The trial court denied this request, but

---

5. AS 10.06.615(c) provides in part that "[t]he board shall give written notice of the commencement of the proceeding for voluntary winding up

by mail to all shareholders and all known creditors and claimants...."

ordered QIT–II, Johnson, and Grass to indemnify Carver if any creditors of QIT–I sued him. Aside from QIT–I's Key Bank loan, which Johnson and Grass personally guaranteed, Carver presented no evidence of the existence or amount of QIT–I's outstanding debt. Given the lack of evidence of any remaining debt, it was not error to limit Carver's remedy to indemnification. The court properly found that the failure to notify QIT–I's creditors of its dissolution was harmless error.

### E. *Carver's Claim for Conversion*

■ Carver alleged that Johnson and Grass committed conversion by retaining QIT–I's assets and failing to compensate him for his share of those assets. The trial court did not make findings regarding Carver's conversion claim. Carver contends that this was error.

■ The tort of conversion is "an intentional exercise of dominion and control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Dressel v. Weeks*, 779 P.2d 324, 328 (Alaska 1989) (citation omitted). Damages in a conversion action are generally the item's value at the time of conversion plus interest. *Id.* The court found that QIT–I had a negative liquidation value upon dissolution. If QIT–I's assets had been sold, Carver would have received nothing for his one-third share. If Carver were to receive damages for conversion in addition to the court-determined value of his share of QIT–I's assets, he would receive a double recovery. The trial court's failure to make findings on Carver's conversion claim is not reversible error.

### IV. *CONCLUSION*

AFFIRMED.