**Donald COLEMAN, Appellant,**

v.

**Mubaarakah COLEMAN, Appellee.**

**No. S–8004.**

Supreme Court of Alaska.

Dec. 11, 1998.

---

**22.** *Agen v. State, Dep't of Revenue,* 945 P.2d 1215,     1219–20 (Alaska 1997).

Edward R. Niewohner and Shauna F. Morris, Niewohner & Wright, P.C., Fairbanks, for Appellant.

No appearance by Appellee.

Before MATTHEWS, Chief Justice, COMPTON, EASTAUGH, FABE and BRYNER, Justices.

*OPINION*

COMPTON, Justice.

I. *INTRODUCTION*

This appeal concerns attorney's fees in a custody case. A Michigan court divorced the parents, but left the issue of custody to the Fairbanks superior court, which had jurisdiction over their children. That court held a custody trial, but, just before final arguments, the mother agreed to let the father have custody in return for stipulations about the children's care. Neither party mentioned attorney's fees in reporting this oral settlement to the court. Ten days later, the mother successfully moved the court to award her roughly half of her actual fees.

The father appeals. Most of his arguments lack merit. His brief does, however, suggest an argument that, if a settlement agreement does not discuss attorney's fees, the court should treat the agreement as leaving the parties to pay their own fees. While that argument has a sound basis in policy, we need not decide in this case whether to adopt a *per se* rule to that effect, for the father has not adequately briefed the issue. Without applying a *per se* rule, we cannot say that the court abused its discretion in this case by declining to infer that the mother, when she agreed to settle the issue of custody without simultaneously securing an agreement on the issue of fees, thereby meant to waive her

entitlement to fees. We thus affirm the award.

## II. *FACTS AND PROCEEDINGS*

Donald Coleman and Mubaarakah Al-Haqq married in 1979. They had four children: Zana (b. 1977), Aidah (b.1979), Shuaraa (b.1981), and Amir (b.1984). Donald and Mubaarakah separated in 1990 or 1991. They had been living in Fairbanks; Donald moved alone to Detroit. In December 1994 Mubaarakah and the three younger children visited Detroit for a funeral. When Mubaarakah left, she let Shuaraa and Amir, the two youngest, stay to live with Donald for the spring 1995 school semester.

On March 13, 1995, Donald filed a complaint for divorce in a Michigan court, requesting permanent custody of all four children. He soon also moved for temporary custody. On March 28 Mubaarakah, unaware of these developments, filed a complaint for divorce, also requesting custody, in the Fairbanks court. Her complaint alleged, *inter alia*, that "[Donald]'s income is significantly higher [than hers], such that he should pay all or a portion of her attorney's fees in this matter," and specified "an award of attorney fees" as part of the judgment prayed.

After an *ex parte* hearing in April, the Michigan court gave Donald temporary custody of Amir and Shuaraa, and Mubaarakah temporary custody of Aidah. Mubaarakah moved the Fairbanks court in May to assert jurisdiction under the Uniform Child Custody Jurisdiction Act, which Michigan has enacted, on the basis that Alaska was the children's "home state." This was so because Shuaraa and Amir had not lived in Michigan for six months before Donald filed his complaint. The superior court—after conferring with the Michigan court, and after Donald failed to make any relevant showing—agreed. In August 1995 the Fairbanks court asserted jurisdiction and granted Mubaarakah temporary custody of all the children.

Despite the Fairbanks court's assertion of jurisdiction, however, the Michigan court entered an order in October 1995 letting Amir remain in Michigan until the end of the fall 1995 school semester. (The order does not mention Shuaraa, but she stayed too.) In January 1996 the Michigan court entered a judgment divorcing the parties and dividing their property. The judgment expressly left it to the Alaska court to determine custody and related issues.

The next day, Donald filed a motion in Fairbanks. The court treated it as a request to extend the temporary custody of Amir and Shuaraa that he was then exercising under the Michigan court's October 1995 order. The court noted that Donald's motion "directly contravenes this Court's [August 1995] order granting Mubaarakah temporary custody," and that Donald had "consciously decided to ignore [the Alaska] proceedings." But it also noted a January 17, 1996, letter from Mubaarakah to Amir saying that he could stay in school in Detroit. The court found that she had "agreed to allow Amir and Shuaraa to remain with their father to finish the [1995–96] school year in Detroit." It declined to "force the children to change schools in mid-semester," but did order Donald to return them "to their mother as soon as the school year ends [i.e., in June 1996]."

Donald also moved the Fairbanks court to dismiss Mubaarakah's divorce complaint, given the Michigan divorce judgment. Mubaarakah cross-moved the court to accept an amended complaint, captioned "Complaint for Child Custody." The amended complaint reiterated her claim about Donald's higher income and her request for attorney's fees. In March 1996 the court accepted her amendment and denied Donald's motion to dismiss.

The court set trial for November 1996. Donald and Mubaarakah submitted Child Support Guidelines Affidavits showing his after-tax income as about $62,000, and hers as only $1,100 (her permanent fund dividend). (Mubaarakah was apparently pursuing a graduate degree at the time.)

The court held trial on November 19–20, 1996. At the time set for final arguments on the 21st, Mubaarakah told the court that she had agreed to let Aidah, Shuaraa, and Amir live with Donald, if the court would incorporate certain stipulations about the children's care in its custody order. (Zana was by then

an adult.) The court orally accepted the agreement as resolving the case.

On December 2 Mubaarakah moved the court to make Donald pay "her remaining attorney fees in the amount of $3,250"—just less than half her total fees. (She had thus far paid $3,450 and had an outstanding bill for $3,256.) On December 20 the court entered findings of fact and conclusions of law awarding joint legal custody, with primary physical custody to Donald. Finding Mubaarakah's income "below the poverty level," the court ordered her to pay the minimum $50 monthly child support. It did not address attorney's fees. On December 31 Donald opposed Mubaarakah's motion for fees. On January 16, 1997, the court signed Mubaarakah's proposed order awarding $3,250, without making any findings or comments. Donald appeals.

## III. DISCUSSION

### A. Standards of Review

■ This case involves several questions of law: first, whether the court had authority to award Mubaarakah fees in this unusual proceeding; second, whether the court had authority to do so upon a motion filed after the pendency of the action; and third, whether it had such authority despite the settlement's silence about fees. We decide these questions de novo, adopting the rules that best reflect precedent, policy, and reason.[1] If the court did have authority to award fees, then it had "broad discretion" in deciding how to exercise that authority, and we will reverse its decision only if it was "manifestly unreasonable."[2]

### B. The Superior Court Had Authority to Award Fees Based on Relative Need Rather than Prevailing–Party Status.

■ Because the Michigan court had already divorced the parties, Donald argues, this case falls in a gap between Alaska's statutes governing divorce actions and those governing motions to modify custody. The only statute in the Parent and Child chapter authorizing attorney's fee awards, AS 25.20.115,[3] governs actions "to modify, vacate, or enforce" custody or visitation orders. The attorney's fee statute that Mubaarakah invoked, AS 25.24.140(a),[4] is part of the divorce and dissolution chapter. Donald argues that since this action was not for "divorce" or "modification," neither provision applied, and nothing authorized the court to award fees other than to the prevailing party under Alaska Civil Rule 82. This opportunistic argument does not persuade us.

We assume arguendo that the Michigan judgment fully concluded Donald and Mubaarakah's "divorce," leaving them, by the time of the Fairbanks proceedings, unmarried people litigating an initial custody dispute. Their case then falls under our rule that "[a]n award of attorney's fees in a 'case between unmarried individuals ... limited to issues of child custody and support' is 'based on [their] relative economic situations and earning powers.' "[5] This rule applies if the case is "closely analogous to custody disputes in divorce cases,"[6] as this one obviously was.

### C. Mubaarakah's Motion Was Timely.

■ Donald relies on the text of AS 25.24.140(a) to argue that Mubaarakah's De-

---

1. See Jones v. Jones, 942 P.2d 1133, 1135–36 (Alaska 1997) (citing Guin v. Ha, 591 P.2d 1281, 1284 n. 6 (Alaska 1979)).

2. Beard v. Beard, 947 P.2d 831, 833 (Alaska 1997) (citing Wright v. Wright, 904 P.2d 403, 410 n. 11 (Alaska 1995)).

3. The statute provides: "In an action to modify, vacate, or enforce that part of an order providing for custody of a child or visitation with a child, the court may, upon request of a party, award attorney fees and costs of the action.... [T]he court shall consider the relative financial resources of the parties and whether the parties have acted in good faith."

4. The statute provides: "During the pendency of the action, a spouse may, upon application and in appropriate circumstances, be awarded expenses, including (1) attorney fees and costs that reasonably approximate the actual fees and costs required to prosecute or defend the action...."

5. Pugil v. Cogar, 811 P.2d 1062, 1067 (Alaska 1991) (quoting Bergstrom v. Lindback, 779 P.2d 1235, 1238 (Alaska 1989)).

6. B.J. v. J.D., 950 P.2d 113, 118–19 (Alaska 1997).

cember 2 motion for fees was late. "During the pendency of the action," the statute says, "a spouse may, upon application ... be awarded ... attorney's fees...." Donald argues that the court ended "the pendency of the action" when it accepted the settlement on November 21, rendering Mubaarakah's December 2 motion (or "application," in terms of the statute) untimely.

This argument is suspect, for we do not in fact require courts to award attorney's fees only during the "pendency of the action." In *Hilliker v. Hilliker,* we said that we favor "a broad reading of AS 25.24.140(a)(1)."[7] We noted that, while the statute "is most logically read as applying only to interim pre-judgment orders," we have in fact treated it as authorizing "post-judgment awards of attorney's fees for trial services."[8] We could, however, apply the statute's plain language to require that a party at least *request* fees "during the pendency of the action," even if the court might *award* fees after the judgment. Donald's argument, however, would still founder on the fact that Mubaarakah requested fees in both her original complaint and her amended complaint.

After the action had arguably ended, she did file a motion, a memorandum of law, and an itemized attorney's bill to spur the court to address the issue. But she had already made an "application" for attorney's fees at the very start of "the pendency of the action."[9] Faced with roughly the same situation forty years ago, a Pennsylvania court noted that a petition for fees filed after a judgment "was not a new application; it merely implemented the original [prejudgment] petition and [acted] entirely as a supplement to it, by setting forth ... an itemized statement of expenses and costs. The

application therefore became a part of the original petition ... on which no final order had been made."[10] We agree with that view, and conclude that Mubaarakah's request for fees was timely.

### D. *Donald's Claim that the Parties' Economic Situations Were Relatively Equal Is Groundless.*

Donald argues that the court abused its discretion in awarding Mubaarakah fees because she had received "an equal share of the parties' property" and an award of "fees" in the Michigan divorce judgment, and because her legal fees and earning capacity roughly equaled his. His arguments are specious.

The Michigan judgment awarded each party the personal property then in their possession; nothing suggests that such property was substantial. The judgment also noted the lack of marital real property, gave Mubaarakah half of Donald's military pension accrued during the marriage, and ordered him to pay her "statutory fees." Mubaarakah has plausibly claimed that she lacks access to the pension. Donald notes no contrary evidence. As for equal expenses, Donald admits that the amount of his attorney's fees "is not part of the record." His reliance on the Michigan judgment's boilerplate award of "statutory fees" is also unavailing. He does not argue, and our research does not show, that the term encompasses attorney's fees, and not just routine costs. Only one contemporary opinion in Westlaw's Michigan family-law database (MIFL–CS) mentions "statutory fees."[11] We found no opinion defining the term; the one that uses it refers in passing to routine costs.[12] Over 375 Michigan fami-

---

**7.** 768 P.2d 115, 116 (Alaska 1988) (citing *L.L.M. v. P.M.,* 754 P.2d 262, 264 (Alaska 1988)).

**8.** *Id.* (citing *Houger v. Houger,* 449 P.2d 766, 772 (Alaska 1969) (accepting without comment a fee award made after judgment)).

**9.** AS 25.24.140.

**10.** *Morgan v. Morgan,* 182 Pa.Super. 182, 126 A.2d 805, 807 (Pa.Super.1956). The quoted analysis is *dictum,* for the court resolved the case by adopting a new rule that courts may award fees in divorce cases even *after* an attorney has rendered the services (making it irrelevant when

Mrs. Morgan had "applied" for fees). *See id.* at 806–07 (rejecting rule of *Breinig v. Breinig,* 26 Pa. 161 (1851)). But the court went on to note that "even under a strict application of the [old] rule," she was entitled to an award because her application had in fact been timely. *See id.* at 807.

**11.** *See Hisaw v. Hayes,* 133 Mich.App. 639, 350 N.W.2d 302, 303 (Mich.App.1984).

**12.** *See id.*

ly-law opinions, on the other hand, mention "attorney's fees" or some variant of this phrase.[13] It follows that the terms "statutory fees" and "attorney's fees" plainly differ.

Donald also claims that Mubaarakah's "earning capacity is more than adequate to pay her own fees and costs" because she has a real estate license and could be earning money thereby instead of seeking a graduate degree. But none of the excerpt pages that he cites support that claim. He argues that she "did not dispute [his] testimony ... that she held a real estate license and could have continued in that well-paying profession." We do not think that he is making that up out of whole cloth, but neither below nor on appeal has he pointed to any specific evidence of what she has earned, or could now earn, in real estate. Mubaarakah's child-support-guidelines affidavit was admissible evidence sufficient to establish her income and support an award of fees. Donald essentially argues that the trial court abused its discretion by not (1) finding that her earning capacity was higher than that actual income and, based on her unrealized potential income, (2) ordering that each party bear his or her own fees.

To accept Donald's argument would be implicitly to conclude that a trial court has discretion, in awarding attorney's fees in a divorce case, to reduce or deny an award to one spouse whose economic situation and current income are much weaker than the other's on the ground that the former has unrealized potential income. Donald cites no case in which a court has done so, and we have found none. This case, though, does not require us to decide whether a court may ever do so, for we conclude that Donald did not satisfy his initial burden of producing evidence on the issue.

We have never discussed the burden of production on the issue of earning capacity for an award of attorney's fees.[14] We assume a case in which spouse X offers sufficient evidence to establish his or her current income. That income leaves X without sufficient resources to be reasonably expected to pay his or her own fees,[15] so X seeks an award of fees. Spouse Y asks the court to reduce or deny the award because X has unrealized potential income. Assuming that a court has discretion to do so, we conclude that Y must bear an initial burden of producing specific evidence of X's earning capacity. Donald, as discussed above, did not carry that burden.

We can dispatch Donald's other arguments in a briefer fashion. He notes our holding in *Johnson v. Johnson*[16] that a trial court may consider the facts that ex-spouses had expended equal money, time, and effort in a divorce, and had their property divided equally.[17] Both Johnsons, though, were bankrupt; neither could pay the other's fees.[18] Here, the only record evidence of the parties' finances are the child support affidavits showing Donald's income of about $62,000 and Mubaarakah's of $1,100. Donald produced nothing to contradict this evidence of his much greater financial capacity. He also notes our comment that, even if one spouse has "greater financial resources and greater earning capabilities, [the other's] resources and capabilities [may be] sufficient enough that a court could reasonably expect her to pay her own fees."[19] But Donald has failed to rebut not only the evidence that Mubaarakah's "resources and capabilities" are meager in *relative* terms, but the evi-

---

13. *See, e.g., Afshar v. Zamarron,* 209 Mich.App. 86, 530 N.W.2d 490, 494 (Mich.App.1995) ("attorney fees"); *Ianitelli v. Ianitelli,* 199 Mich.App. 641, 502 N.W.2d 691, 693 (Mich.App.1993) ("attorney's fees"); *Phinisee v. Rogers,* 229 Mich. App. 547, 582 N.W.2d 852, 853 (Mich.App.1998) ("attorneys fees").

14. *Cf. Dunn v. Dunn,* 952 P.2d 268, 270 (Alaska 1998) (stating rule that, in child-support determination, obligor parent bears burden of establishing his or her earning capacity) (citing *Kowalski v. Kowalski,* 806 P.2d 1368, 1372 (Alaska 1991)).

15. *See H.P.A. v. S.C.A.,* 704 P.2d 205, 212 (Alaska 1985).

16. 564 P.2d 71 (Alaska 1977).

17. *See id.* at 77.

18. *See id.* at 76.

19. *H.P.A.,* 704 P.2d at 212.

dence that they are insufficient in *absolute* terms for us to "reasonably expect her to pay her own fees." The court did not abuse its discretion in not requiring her to do so.

### E. *Mubaarakah Did Not Unnecessarily Increase the Cost of Litigation in Any Way Compelling a Denial of Fees.*

■ Donald argues that Mubaarakah "unnecessarily escalated the costs of the instant case by changing her mind" after agreeing, apparently during the winter of 1995–96, to let the children stay in Detroit. The record on this issue is scant and confusing, and Donald's argument is cursory. We note that, even if Mubaarakah did vacillate in her view of what was best for the children, such conduct is not the sort of bad-faith vexatious or deceptive conduct that we have held to justify courts in divorce cases in reducing an award of attorney's fees (or enhancing an award against a wrongdoing spouse).[20]

By keeping Amir and Shuaraa in Detroit, moreover, Donald flouted the Alaska court's August 1995 order asserting jurisdiction and giving Mubaarakah interim custody. That court later found that he had "consciously decided to ignore [the Alaska] proceedings." After Donald persuaded the Michigan court to decree that Amir could stay in Detroit for the fall 1995 semester, Mubaarakah protested to the Alaska court, but not to the Michigan court. She has affied that she "did not have the resources to attempt to enforce the [Alaska] custody order in Michigan." Thus, even if she did later make and then break an informal agreement to let Donald keep the children, she did so while Donald was taking advantage of three thousand miles of separa-

tion, and her lack of resources, to ignore a court order. In these circumstances, we cannot say that the court abused its discretion in rejecting his argument that Mubaarakah had engaged in litigation misconduct justifying a denial of fees.

### F. *Mubaarakah's Failure to Insist, in Settling Custody, that Donald Pay Her Fees Does Not Bar an Award.*

■ Donald argues that Mubaarakah's motion for fees came too late because it came after their settlement, which did not mention fees. "If [she] had wanted attorney fees as part of the Settlement Agreement," he argues, "she should have asked for them at the time of [s]ettlement." Donald's view of items not included in a settlement agreement makes sense, and the rule that he suggests may be wise. A settlement agreement is a contract,[21] and we are as leery of adding unnegotiated terms to it as to any other contract.[22] An agreement's silence as to fees thus may be seen as a meaningful part of the parties' overall bargain, which we should not disturb.

We have never held, however, that a settlement agreement's silence about fees bars an award thereof. We expressly reserved the question two decades ago in *Tobeluk v. Lind.*[23] There, the parties had addressed but not agreed on fees while settling their dispute.[24] We did not hold that this barred an award, although we did note that "the better practice would be for the parties to include a fee provision in the settlement agreement, or at least to reserve the question for judicial determination."[25]

---

**20.** *See, e.g., Beard v. Beard,* 947 P.2d 831, 834–35 (Alaska 1997) (affirming reduction of award to one-half of actual fees where spouse with lesser earning power had answered divorce complaint late, violated repeated orders to vacate family home, and "litigated and relitigated almost every issue"); *Wright v. Wright,* 904 P.2d 403, 410–11 (Alaska 1995) (affirming award of full actual fees against husband who had assiduously hidden marital assets, which wife spent over $100,000 to locate).

**21.** *See, e.g., Gaston v. Gaston,* 954 P.2d 572, 574 (Alaska 1998) (interpreting custody agreement).

**22.** *See, e.g., Davis v. Dykman,* 938. P.2d 1002, 1007 (Alaska 1997) (declining to enforce settle-

ment agreement because parties had not agreed on key term, and " 'courts should not impose on a party any performance to which he did not and probably would not have agreed' ") (quoting *Rego v. Decker,* 482 P.2d 834, 837 (Alaska 1971)).

**23.** 589 P.2d 873, 879 n. 13 (Alaska 1979).

**24.** *See id.* at 875.

**25.** *Id.* at 879 n. 13. We were leery of deciding the issue in *Tobeluk,* because that case involved a public-interest suit whose settlement, by legislative enactment, reflected a "political decision" that we were reluctant to unsettle. *See id.* at 880–81, 878–79 nn.11, 13.

We need not decide today whether to adopt an inflexible rule that, if a settlement agreement does not mention fees, a court is bound as a matter of law to interpret the agreement to leave each party to bear his or her own fees.[26] Donald's brief assertion of the propriety of such a rule is unadorned by the citation of any authority. We do not have the benefit of the presentation of an opposing view. Since the issue has not been properly briefed, adoption of such a rule is not before us for determination.

Our advice that it is the better practice to address fees in all settlement agreements arose in a suit governed by Rule 82, under which a court awards fees to the prevailing party. As advice, it applies equally to cases in which entitlement to fees does not depend on the merits, such as divorce cases, in which we base awards on relative need, not on who "prevailed."[27] (We award fees on this basis because often no party "prevails"[28] in divorce cases and in order to ensure that both spouses have "means to litigate the divorce action on a fairly equal plane."[29])

There is a difference, however, between advising parties to address attorney's fees in all future settlement agreements, and interpreting an agreement in a case in which the parties failed to do so. Because we have not adopted a *per se* rule for the latter task, we must determine whether the superior court erred in this case in inferring the parties' intent about fees, on which their agreement is silent. To a court drawing such an inference, divorce cases and Rule 82 cases may well differ. Because we do not base fee awards in divorce cases on who prevails, the two forms of relief that Mubaarakah sought—custody, and a fee award based on Donald's greater wealth—were independent. There is no reason to presume that, in set-

tling one, she and Donald meant to settle the other. They did not expressly address fees. Donald has not alleged that they did so implicitly, but then failed to express that part of their agreement to the court. Such an allegation might make this a different case. But Donald's brief makes only the cursory policy argument that we have declined to reach.

If one party agrees to settle without successfully insisting that the other agree to pay its fees, arguably that failure reflects the relative strength of their negotiating positions. Yet we decline to infer that Mubaarakah's decision to settle custody entailed a calculated tradeoff of her right to fees. Her entitlement to fees based on relative need was independent of the outcome, or the strength of her bargaining position, on the merits. Indeed, we presume that her decision to settle reflected not a financial calculation, but a conclusion that it would be best for her children to live with Donald. Her ability to reach and admit that conclusion at the climax of a long custody fight is laudable. We decline to hold that, because she did not withhold that conclusion and use it instead as a bargaining chip to extract a concession on fees, the trial court should have inferred that she meant to waive her entitlement to fees, when that entitlement is independent of the outcome of the litigation.

## IV. CONCLUSION

We AFFIRM the superior court's award of attorney's fees.

26. *Cf. id.* at 881 (Matthews, J., concurring) (advocating adoption of such a rule).

27. *See, e.g., L.L.M. v. P.M.,* 754 P.2d 262, 263–64 (Alaska 1988).

28. *See id.* at 264 (citing *Cooper v. State,* 638 P.2d 174, 180 (Alaska 1981)).

29. *Lone Wolf v. Lone Wolf,* 741 P.2d 1187, 1192 (Alaska 1987).